Slip Op. 11–8

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| XEROX CORPORATION,<br><br>                    Plaintiff,<br><br>           v.<br><br>UNITED STATES,<br><br>                    Defendant. | **Before: Gregory W. Carman, Judge**<br><br>Court No.  07-00337 |

[*Defendant's motion to dismiss is denied.  Customs' final determination is remanded for further action consistent with this Opinion and Order.*]

Dated: January 24, 2011

Neville Peterson LLP (<u>John M. Petersvon</u>, <u>Michael T. Cone</u>), for Plaintiff.

<u>Tony West</u>, Assistant Attorney General, <u>Barbara S. Williams</u>, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>Saul Davis</u>, <u>Aimee Lee</u>); <u>Chi S. Choy</u>, of counsel, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, U.S. Department of Homeland Security, for Defendant.

### OPINION & ORDER

**CARMAN, JUDGE:** Plaintiff Xerox Corporation ("Plaintiff" or "Xerox") has brought this action pursuant to 28 U.S.C. § 1581(e) to challenge a final determination issued by Customs and Border Protection ("Customs" or "CBP") relating to the country of origin of certain laser printer toner cartridges for purposes of government procurement.  This is the first case brought in the U.S. Court of International Trade pursuant to 28 U.S.C. § 1581(e).  Defendant United States ("Defendant," "United States" or the "government")

has moved to dismiss under USCIT Rule 12(b)(1), alleging that the particular

determination Customs actually made in this instance is not the type of determination

this court has jurisdiction to review, and that this case does not present a justiciable

controversy.   For the reasons set forth below, Defendant's motion is denied.

B<small>ACKGROUND</small>

## I.        Statutory Context of Jurisdictional Questions

When Congress passed the Trade Agreements Act of 1979 ("TAA"), it conferred

upon the Customs Court, and subsequently upon the U.S. Court of International Trade,[1]

"exclusive jurisdiction of any civil action commenced to review any final determination

of the Secretary of the Treasury under section 305(b)(1) of the Trade Agreements Act of

1979."  28 U.S.C. § 1581(e).  Section 305(b)(1) of the TAA, codified at 19 U.S.C.

§ 2515(b)(1), states that the Secretary of the Treasury (or Customs, the Secretary's

designee[2]) "shall provide for the prompt issuance of advisory rulings and final

determinations on whether . . . an article is or would be a product of a foreign country

---

[1]Section 1001(b)(4)(B) of the TAA amended former 28 U.S.C. § 1582 (1976) on July 26, 1979, conferring jurisdiction on the Customs Court to exercise judicial review over these final determinations.  Pursuant to the Customs Courts Act of 1980, jurisdiction was reassigned to the Court of International Trade, effective November 1, 1980, and codified at 28 U.S.C. § 1581(e).

[2]For more on the transfer of functions from the Secretary of the Treasury to the Secretary of Homeland Security, see the note "Transfer of Functions" following 28 U.S.C. § 2631.

or instrumentality designated" by a separate statute as eligible for certain benefits

described below.  19 U.S.C. § 2515(b)(1).  The TAA establishes a rule of origin for CBP to

apply in making these determinations, set out in 19 U.S.C. § 2518(4)(B), and also sets out

criteria for how a foreign country or instrumentality becomes "designated," 19 U.S.C.

§ 2511(b).  To understand the purpose of a final determination made under § 2515(b)(1)

(a "Section 305(b)(1) final determination"), and the role of this Court in reviewing these

final determinations pursuant to § 1581(e), one must first have a broad view of the

statutes and regulations pertaining to country of origin in government procurement.

When purchasing goods for its own use, the federal government has long had a

preference for domestically manufactured products.  This preference was established in

1933 by the Buy American Act (41 U.S.C. §§ 10a-10d) ("BAA"), which remains in effect

today, and has recently been described as "the immovable object" of U.S. government

procurement law.[3]  The BAA does not *mandate* that the government make purchases of

domestic goods, but rather establishes a domestic *preference*.  This preference is

implemented by regulations which require that, when both foreign and domestic offers

have been received for a particular procurement contract, the contracting officer must

---

[3]John A. Howell, *The Trade Agreements Act of 1979 versus The Buy American Act: The Irresistible Force Meets The Immovable Object*, 35 Pub. Cont. L. J. 495 (Spring 2006).

add a margin to the foreign offer, typically of 6, 12 or 50 percent, before comparing the

bids and awarding the contract.  48 C.F.R. §§ 25.105(b), 225.105(b).

While the Buy American Act remains a significant part of the government

procurement landscape, its effect was dramatically altered by the Trade Agreements

Act of 1979, which permits the domestic preference of the BAA to be waived under

certain conditions.  Title III of the TAA implements the Agreement on Government

Procurement ("GPA"), which is a plurilateral agreement developed during the Tokyo

Round for the purpose of creating and protecting international reciprocity in

government procurement.  S. REP. NO. 96-249, at 128 (1979), reprinted in 1979

U.S.C.C.A.N. 381, 514.  When a party to the GPA is procuring products above a certain

price threshold, that party agrees to treat products from other GPA parties no less

favorably than it treats domestic products.  Through the TAA, the United States has also

extended this benefit of no-less-favorable treatment to countries that extend reciprocal

government procurement opportunities to the U.S. (even if such countries are not

parties to the GPA), and to least developed countries (without demand for reciprocity).

Collectively, parties to the GPA, countries extending GPA-equivalent opportunities to

the U.S. and least developed countries are referred to as designated foreign countries

and instrumentalities ("DFCIs").  See 19 U.S.C. § 2511(b)(1)–(4).  Additionally, as an

incentive to encourage adoption of the GPA by other foreign countries, the TAA allows

the U.S. to prohibit procurement of otherwise eligible products from foreign countries

that are not a DFCI.  19 U.S.C. § 2512.  The net effect of the TAA is that for procurement

offers above the price threshold, the domestic preference imposed by the BAA is *waived*

for all articles that are "products of" a designated foreign country or instrumentality.

<u>See</u> 19 U.S.C. § 2511(a).

## II.     The Section 305(b)(1) Final Determination

The final determination of whether an article "is . . . a product of" a DFCI is the

determination that this Court has jurisdiction to review.  28 U.S.C. § 1581(e); <u>see also</u> 19

U.S.C. § 2515(b)(1).  Customs has promulgated regulations to establish the procedures

through which it would issue Section 305(b)(1) advisory rulings and final

determinations.  <u>See</u> 19 C.F.R. Part 177, Subpart B.  These regulations implement

various aspects of the TAA, including the applicable rule of origin (<u>compare</u> 19 U.S.C.

§ 2518(4)(B), <u>with</u> 19 C.F.R. § 177.22(a)), and the definition of who qualifies as a party-at-

interest with the right to request a country-of-origin determination or to seek its judicial

review (<u>compare</u> 28 U.S.C. § 2631(e), (k)(2),[4] <u>with</u> 19 C.F.R. §§ 177.22(d), 177.23, 177.30).

---

[4]The party-at-interest language was originally included in Section 1001 of the
TAA, which assigned jurisdiction to judicially review these determinations to the
Customs Court.  The Customs Courts Act of 1980 removed the party-at-interest
language from the jurisdictional statute (newly created 28 U.S.C. § 1581), and placed it
in 28 U.S.C. § 2631.

Over the three decades that the TAA has been in effect, Customs has rendered

final determinations pursuant to Section 305(b)(1) that, while consistent with the statute,

are arguably more specific than minimally statutorily required.  The statute provides for

the issuance of final determinations as to whether "an article is or would be a product of

a foreign country or instrumentality designated pursuant to 19 U.S.C. § 2511(b)"—a

question that could be answered accurately, if somewhat narrowly, with a "yes" or a

"no."  <u>See</u> 19 U.S.C. § 2515(b)(1).  The phrase "country of origin determination" does not

appear in Section 305(b) of the TAA, and nothing in the statute compels Customs to

make formal pronouncement about what the country of origin is for a given

article—only whether it is a product of a DFCI.  And yet, Customs has chosen to

implement this statute via regulations requiring itself to produce full blown "country-

of-origin determinations" in virtually every case where a Section 305(b)(1) final

determination has been requested.  <u>See</u> 19 C.F.R. § 177.21 (explaining that "[t]his

subpart applies to the issuance of **country-of-origin** . . . **final determinations**"), <u>and</u>

§ 177.23 (explaining who may request a "**country-of-origin** . . . **final determination**")

(emphases added).

Customs' regulatory construal of Section 305(b)(1) is not inconsistent with the

statute, because when the country of origin of an article has been identified, it is self-

evident whether that country is a DFCI.  When issuing final determinations pursuant to

this subpart, Customs routinely frames the issue presented as "what is the **country-of-origin** of [Product X] for the purpose of U.S. government procurement?"  Customs then typically issues its ruling in the form: "the **country of origin** of [Product X] for the purpose of U.S. government procurement is [Country Y]."  Because Country Y either is or is not a DFCI, Customs' ruling therefore satisfies the requirement of Section 305(b)(1).

Moreover, the notion that Section 305(b)(1) should be implemented with a country-of-origin determination has its roots in the legislative history of the TAA, and has been consistently applied by Customs for over thirty years.  The first reference to the Section 305(b)(1) final determination as identifying "the **country of origin** of specified products" is found in the Senate Report to the TAA.  1979 U.S.C.C.A.N. at 523 (emphasis added).  And from the first proposed draft (published April 9, 1981) to the current heading of 19 C.F.R. Part 177, Subpart B, Customs has consistently referred to the Section 305(b)(1) final determination as a "**country-of-origin determination**."  <u>See</u> 46 Fed. Reg. 21,194-01; <u>see</u> <u>also</u> 19 C.F.R. Part 177, Subpart B (2010).

It bears noting—for reasons that will become clear upon hearing Defendant's contentions in this case—that the statute does not mandate any specific outcome of a Section 305(b)(1) final determination, and is indifferent to which particular outcome the party requesting the ruling is hoping to obtain.  As long as Customs' ruling makes clear whether or not the article in question "is or would be a product of" a designated foreign

country or instrumentality, it has conformed with the statutory requirement.  <u>See</u> 19

U.S.C. § 2515(b).  In fact, the statutory scheme seems designed to produce rulings

sought by parties whose economic incentive is to obtain a "negative" ruling.  The

remarkably broad party-at-interest standards crafted by Congress not only permit

rulings to be issued to parties that wish to qualify their own product as TAA waiver-

eligible, but also to parties hoping for a ruling that a competitor's product is *not* from a

DFCI, and therefore *not* waiver-eligible.  <u>See</u> 28 U.S.C. 2631(e), (k)(2); 19 C.F.R.

§§ 177.22(d), 177.23.

In other words, the Section 305(b)(1) final determination is highly mechanical.

Any party-at-interest can request a final determination about any article for which they

qualify as a party-at-interest.  So long as that party complies with the regulatory

requirements for requesting a ruling, and provides enough information for Customs to

reach a conclusion, a final determination will issue.  <u>See</u> 19 C.F.R. § 177.23-.28

(specifying, *inter alia*, who may request a Section 305(b)(1) determination; the form and

contents of that request; how, where and by whom it is to be filed; how to request oral

discussion of the issues; and that Customs, upon receipt of a properly made request,

"will promptly issue a final determination.").  By issuing the final determination in the

format Customs prefers ("the country of origin of [Product X] . . . is [Country Y]"), all

parties-at-interest are left with an outcome that both answers the central question posed

by the statute, and complies with the regulatory requirement to issue a country-of-origin determination, thereby providing valuable additional specificity.  Once issued, the determination comes with no strings attached; these parties-at-interest are free to use a Section 305(b)(1) final determination for whatever purpose they see fit.

**III.    Rules of Origin Under the TAA and BAA**

While Customs' regulations spell out the conditions under which determinations can be obtained, the substance of the Section 305(b)(1) final determination is found in the application of a rule of origin, set out in the TAA, to the facts of a particular product's manufacture.  <u>See</u> 19 U.S.C. §§ 2515(b)(1), 2518(4)(B). Under the TAA rule of origin,

> An article is a product of a country or instrumentality only if (i) it is wholly the growth, product, or manufacture of that country or instrumentality, or (ii) in the case of an article which consists in whole or in part of materials from another country or instrumentality, **it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed**.

19 U.S.C. § 2518(4)(B) (emphasis added).  Disputes under part (i) of this rule of origin would be rare.  Consequently, in the context of a Section 305(b)(1) final determination, conflicts regarding the country of origin typically hinge on where a particular article is found to have been substantially transformed.[5]  While this is the first 28 U.S.C. § 1581(e)

-----------------------

[5]For ease of reference, the court will refer to this rule of origin from the TAA simply as a "substantial transformation" rule of origin.

case brought at the U.S.C.I.T., the court has frequently dealt with similar substantial

transformation issues in the context of reviewing other types of country of origin

determinations.  See, e.g., Ugine and ALZ Belgium, N.V. v. U.S., 31 CIT 1536, 1541-43,

517 F. Supp. 2d 1333, 1337-38 (2007) (noting the substantial transformation

determinations made by both Customs and the U.S. Department of Commerce in the

context of a countervailing duty proceeding), Torrington Co. v. U.S., 8 CIT 150, 596 F.

Supp. 1083 (1984) (making a substantial transformation determination in the context 28

U.S.C. § 1581(a)).

        The substantial transformation rule of origin stands in contrast to the rule of

origin that applies under the Buy American Act.  In order for a good to be considered a

"domestic end product," procurable under the BAA, it must be manufactured in the

United States "substantially all from articles, materials, or supplies mined, produced, or

manufactured . . . in the United States."  41 U.S.C. § 10a(a).  By executive order,

"substantially all" has been clarified to mean greater than 50% domestic content.  Exec.

Order No. 10,582, 19 Fed. Reg. 8,723 (Dec. 17, 1954), reprinted as amended after 41

U.S.C. § 10d at 346-47 (2006).

        The disparity between the applicable rules of origin under the TAA and the BAA

is not without consequence.  As originally implemented, this incongruity threatened to

effect a *dis*advantage for certain goods manufactured in the U.S., that was nothing short

of ironic.  While the purpose of the TAA had been to extend no-less-favorable treatment

to products from preferred trading partners than was given to domestic products, it

soon became clear that certain foreign goods might be treated *more* favorably than

goods comparably produced in the United States.  Specifically, there was uncertainty as

to the procurement eligibility of goods substantially transformed in the United States

from mostly foreign components.

These so-called "U.S.-made end products" cannot receive the BAA's domestic

procurement preference, because they are distinct from domestic end products, which

meet the 50% domestic content requirement of the BAA.  However, they were not

automatically guaranteed to fare better under the TAA.  Because U.S.-made end

products are not substantially transformed in a designated *foreign* country or

instrumentality, they were thought not to be eligible for a TAA waiver of BAA

requirements.  <u>See</u> <u>generally</u> 19 U.S.C. § 2511.  But at the same time, while U.S.-made

end products did not appear to qualify for preferential treatment under the BAA or the

TAA, the TAA does not permit their procurement to be prohibited.  The prohibition

provision of the TAA only applies to goods substantially transformed in *foreign*

countries that are not a DFCI.  <u>See</u> 19 U.S.C. § 2512.  The consequence of the bare

overlay of the rules of origin in the BAA and the TAA was the peculiar, and politically

unpalatable prospect that a good substantially transformed in a DFCI—say,

Canada—from entirely foreign components, could be preferred in U.S. government

procurement over an identical product substantially transformed in the U.S. from the

*same* foreign components.  Fortunately, as will be explained below, administrative

action has spared U.S.-made end products from such an ignominious fate.

## IV.      The Section 305(b)(1) Final Determination at Issue in This Case

Xerox challenges a final determination issued in ruling letter HQ H009107 on

August 2, 2007 to Nukote International—a company that is not a party to this action.

(See Compl., Ex. A.)  Nukote had sought a Section 305(b)(1) final determination

regarding the country-of-origin of its refurbished laser printer toner cartridges.  (Id.)

Customs was presented with three different manufacturing scenarios, and was asked to

determine the country-of-origin for the printer cartridges in each.  Customs framed the

issue as "[w]hat is the country of origin of the subject laser printer cartridge models for

the purpose of U.S. Government procurement?"  (Id.)  Customs' holding in HQ

H009107 was that the merchandise in question was not substantially transformed in the

United States.  (Id. at 3.)  Customs did not articulate *where* the goods were substantially

transformed, and therefore did not positively identify the country of origin.  (See id.)

Moreover, Customs' ruling did not otherwise establish whether or not the articles in

question were products of a designated foreign country or instrumentality.  (See

generally, id.)

Xerox has brought this case seeking a determination from the Court that

Customs erred, because the processing of Nukote's goods in the United States was

sufficient to effect substantial transformation, and that the country of origin for

purposes of government procurement is therefore the United States.  (Compl. ¶¶ 21-42.)

While the Court was not provided with a copy of Nukote's original request that

precipitated this ruling letter, based on the way Customs framed its holding, it appears

that Nukote presented the question to Customs in essentially the same way–seeking a

determination of whether or not its goods had been substantially transformed in the

United States.

**PARTIES' CONTENTIONS**

## I.      Defendant's Contentions

Defendant advances two central arguments in its motion to dismiss: (1) that the

determination issued by Customs is not a final determination described in Section

305(b)(1), and the Court therefore lacks jurisdiction to review it, and (2) that even a

favorable ruling from the Court is incapable of providing meaningful relief to Xerox,

and as such this case raises no justiciable controversy.  (Mem. In Supp. Of Def.'s Mot.

To Dismiss This Action ("Def.'s Mot.") 1-3, 9-21.)

In making its first argument, Defendant points out that 28 U.S.C. § 1581(e)

jurisdiction is only available to review a final determination issued pursuant to Section

305(b)(1) of the TAA.  Quoting the language of Section 305(b)(1), Defendant argues that

in the present case "Customs **never** made a determination on whether the products in

question were, or were not,[6] a product of a designated foreign country or

instrumentality," and that therefore, "conspicuously absent is a decision by Customs

that is reviewable by the Court pursuant to section 1581(e)."  (Id. at 13 (internal

quotation omitted) (emphasis in original).)  Instead, Defendant argues that Customs

decided whether or not Nukote's toner cartridges were products of the United States, a

final determination it believes falls outside the scope of Section 305(b)(1).  (Id. at 12-13.)

Defendant offers no theory as to why its client—Customs—issued a ruling that it now

claims was without statutory authorization.

        The government evinces its belief that the only reason Nukote and Xerox could

have possibly wanted a determination that the goods in question were substantially

transformed in the United States would be to qualify these goods for procurement

---

[6]In its reply, Defendant actually takes this argument a step further, claiming that
under Section 305(b)(1) and 19 C.F.R. § 177.21, Customs is "only permit[ted] to make
rulings *related to products of foreign designated countries and instrumentalities*." (Def.'s
Reply to Pl.'s Opp'n. to Def.'s Mot. to Dismiss this Action ("Def.'s Reply.") 12 (emphasis
added).)
        If Customs' decision making ability during a Section 305(b)(1) final
determination was constrained as suggested by Defendant, Customs would be
prohibited from issuing a determination about any product which it might conclude
was not a product of a designated foreign country or instrumentality.  Clearly, as
negative determinations are fully contemplated by the statute, Defendant's view is
unduly restrictive.

under the Buy American Act.  Defendant points out that this would not work.  Citing

the "different criteria for the determination of country of origin" under the BAA and

TAA, Defendant points out—correctly—that "the criteria for one cannot be substituted

for the other."  (<u>Id.</u> at 13.)  A ruling that Nukote's goods were substantially transformed

in the U.S. would not address whether they met the 50% domestic content requirement

of the BAA.  Defendant can imagine no other purpose for which Nukote or Xerox could

have wanted the requested ruling.

Defendant's second argument—that this case lacks a justiciable controversy—is

built on its belief that the ruling sought by Nukote and Xerox would be useless.

Because the government believes that "the only relief that would be meaningful to

Xerox" would be a determination that its goods qualify for U.S. government

procurement under the BAA, and because HQ H009107 only addresses itself to the

issue of substantial transformation, Defendant claims that a determination by the Court

that Plaintiff's goods were substantially transformed in the U.S. would be worthless.  In

addition to assailing the "meaningful[ness]" of any relief the Court could provide,

Defendant also characterizes such relief as not "effectual," not "consequential", not

"concrete", not "specific", not "conclusive", and with "no practical application."  (Def.'s

Mot. 17-20.)

## II.    Plaintiff's Contentions

Xerox responds to the motion to dismiss primarily by asserting that Defendant's

arguments evince a misunderstanding of the status of the U.S.-made end product in

government procurement.  (Mem. in Opp'n. to Def.'s Mot. to Dismiss ("Pl.'s Resp.")

12-19.)  According to Xerox, Nukote's ruling request (and Xerox's case) are not

misguided attempts to qualify the goods in question for government procurement

under the BAA, nor did they need to be, because "at all times relevant to this litigation,"

federal regulations establish that U.S.-made end products were eligible for government

procurement in their own right.  (Id. at 16 (citing 48 C.F.R. §§ 25.003, 25.403.)

Plaintiff devotes virtually all of the argument in its response brief to

demonstrating that Defendant's understanding of government procurement law is

considerably out of date.  (Id. at 12-19.)  Plaintiff cites a 1990 decision by the General

Services Administration Board of Contract Appeals ("GSBCA") in which this "federal

tribunal" addressed the conundrum created by the overlapping rules of origin between

the BAA and TAA, described above.  (Id. at 12-16); see also supra at 9-12.  In Protest of

International Business Machines Corporation, 90-2 B.C.A. (CCH) P22,824, 1990 GSBCA

LEXIS 213 (May 18, 1990), IBM had offered certain computers for sale to the U.S.

government that had been substantially transformed in the United States but that did

not contain more than 50% domestic content.  Id. at *10-11.  By operation of a federal

acquisition regulation in effect at the time, IBM's offer was rejected: the computers did

not qualify as designated country end products under the TAA, and did not qualify as

domestic end products under the BAA.  <u>Id.</u>  The GSBCA reviewed the regulation that

had led to the exclusion of IBM's U.S.-made end products in the government

procurement bidding process, and held that it was inconsistent with 19 U.S.C. § 2512,

which only permits the exclusion of products from foreign countries that have not been

designated.  <u>Id.</u> at *17-21.  The GSBCA found that goods like IBM's could not be

excluded from government procurement by virtue of the TAA.  <u>Id.</u>  As a result, the

General Services Administration, which was bound by the GSBCA determination,

created a special category of procurable goods it denoted "U.S.-made end products."

<u>General Services Administration Acquisition Regulation</u>, 55 Fed. Reg. 46,068-01

(temporary rule Nov. 1, 1990); 57 Fed. Reg. 42,708-01 (final rule Sep. 16, 1992).  Over the

following decade or so, the U.S.-made end product came to be viewed as a sensible

component of government procurement law, and exceptions were created for it by the

heads of individual agencies, and eventually in the general federal acquisition

regulations and defense federal acquisition regulations.  (Pl.'s Resp. at 16-19); <u>see also</u>

<u>Defense Federal Acquisition Regulation Supplement</u>, 62 Fed. Reg. 47,407-01 (proposed

rule Sep. 9, 1997) (waiving the restrictions of the BAA for Defense Department

acquisition of certain information technology products), <u>Federal Acquisition Regulation;</u>

<u>Foreign Acquisition (Part 25 Rewrite)</u>, 64 Fed.Reg. 72,416-01, 72,422 (final rule Dec. 27,

1999) (creating a category for U.S.-made end products in the general Federal

Acquisition Regulations).  As a result of these and other changes to the government

procurement landscape, it has been the case for many years, and at all times relevant to

this litigation, that products substantially transformed in the U.S. are highly eligible for

government procurement.

While Plaintiff therefore responds to Defendant's second argument in great

detail, it devotes considerably less attention to Plaintiff's first argument – that the

determination issued by Customs in this case is not a Section 305(b)(1) determination.

On that point, Plaintiff simply points out that HQ H009107 was "rendered pursuant to

Section 305(b)(1) of the Trade Agreements Act of 1979."  (Pl.'s Resp. at 8.)  Plaintiff does

not address the apparent disparity identified by Defendant: how a final determination

as to whether the goods in question were substantially transformed in the United States

satisfies the requirement of Section 305(b)(1) that Customs decide whether the articles

are products of "a foreign country or instrumentality designated" pursuant to the TAA.

19 U.S.C. § 2515(b).

**ANALYSIS**

## I.      This Case Presents a Justiciable Controversy

Defendant's argument that this case lacks a justiciable controversy, because even

a favorable ruling on Xerox's claims could not provide Plaintiff with meaningful relief,

is without merit.  The relief sought by Xerox in its Complaint is an order that would "set

aside the final determination of Customs as unlawful," and "such further and

additional relief as this Court may deem proper."  (Compl. at 14.)  Defendant does not

argue that this relief is fundamentally unavailable, but rather claims that Plaintiff will

not be able to turn such a judgment into something with real utility or economic value.

That concern does not raise a problem of justiciability.  Moreover, given the status of the

U.S.-made end product in government procurement, it appears that, should Xerox

prevail in this case, it would have no trouble extracting utility out of a favorable

judgment.

        This case is justiciable because it presents an appropriate occasion for judicial

action.  See 13 Wright & Miller § 3529.  Namely, it presents "a real and substantial

controversy" between Xerox and the government, which the Court may resolve by

providing "specific relief through a decree of conclusive character."  See Aetna Life Ins.

Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 241 (1937).  Contrary to Defendant's

assertions, this case will not require the court to stray "into a prediction of future

events," nor does it involve "uncertain or contingent future events" at all.  (See Def.'s

Mot. at 16 (citations omitted).)  Namely, it is *possible* the Court could determine that the

goods described in the ruling letter were substantially transformed in the United States,

or in some other country, and reverse the determination made by Customs.  Plaintiff

faces no more of a challenge in rendering economic value from such a favorable

judgment than a plaintiff in any civil case.  It is always incumbent on a plaintiff to know

why it seeks a particular ruling, and the fact that the Defendant is puzzled by Plaintiff's

motivation does not raise a problem of justiciability.  As noted above, the right to obtain

a Section 305(b)(1) final determination (or to obtain judicial review of it) is unaffected by

the motivation of the party requesting the determination, and the consequences that

flow from it.  See supra at 7-8.

Moreover, Defendant's qualms about a potential judgment lacking meaning stem

from a radical misapprehension of the state of government procurement law.  As Xerox

has compellingly demonstrated, the U.S.-made end product has been highly procurable

for quite some time.  Accordingly, a ruling that a particular article has been

substantially transformed in the U.S. has great potential value.  Nukote and Xerox are

by no means the only parties to have seen economic value in this type of ruling.  The

Court's review of relevant legal databases reveals that no less than half of the Section

305(b)(1) final determinations issued by Customs over the last 30 plus years have dealt

squarely with the issue of whether a given article was substantially transformed in the

United States.  Therefore, hearing no persuasive argument to the contrary, the Court

finds that this case presents a justiciable controversy.

## II.      HQ H009107 Contains a Section 305(b)(1) Final Determination

The government's remaining argument—that the Court lacks jurisdiction

because the final determination issued by Customs in HQ H009107 is not a Section

305(b)(1) determination—is also unavailing.  The ruling letter states that it is issued

"[p]ursuant to Subpart B of Part 177, 19 CFR [§] 177.21 *et seq.*, which implements Title III

of the Trade Agreements Act of 1979, as amended (19 U.S.C. § 2511 *et seq.*).[.]"  It could

scarcely be clearer.  When Customs issued this ruling, it did so pursuant to its authority

conferred by Title III of the TAA.  The document Customs produced indicates that the

agency issued what it believed to be a Section 305(b)(1) final determination.  Moreover,

under 28 U.S.C. § 1581(e), this court has exclusive jurisdiction to review "**any** final

determination . . . under section 305(b)(1)."  28 U.S.C. § 1581(e) (emphasis added).  Even

if the decision actually rendered contains shortcomings, HQ H009107 is clearly *a* final

determination under Section 305(b)(1) and as such, the court has jurisdiction to review

it.

It must be noted that Customs flirted briefly with the theory here advanced by its

attorneys, but ultimately chose the analysis advocated by Plaintiff.  In the first Section

305(b)(1) final determination issued after the GSBCA's decision in IBM, HQ 734977,

Customs explained that, on advice of the U.S. Trade Representative, it believed it was

"not authorized to render final determinations concerning whether an article is a

product of the U.S. for purposes of Title III of the Trade Agreements Act," because

Section 305(b)(1) final determinations may only be made about products of designated

foreign countries, a category that necessarily excludes the United States.  Final

Determination - U.S. Government Procurement, 1993 U.S. Custom HQ Lexis 2084 at

*3–*4. (April 2, 1993); see also Gary H. Sampliner & Brian J. O'Shea, *Rules of Origin for*

*Foreign Acquisitons Under the Trade Agreements Act of 1979, NAFTA, and the New GATT*

*Accords*, 23 Pub. Cont. L.J. 207, 220-21 (1994).  However, Customs quickly abandoned

this position without apparent explanation.  In the very next Section 305(b)(1) final

determination issued by the agency (HQ 735346), Customs proceeded *without objection*

to determine that the country of origin of some articles in question was the United

States.  U.S. Government Procurement; Final Determination; 1995 U.S. Custom HQ

Lexis 243 at *9, *18–*19 (Feb. 23, 1995).[7]  No rationale was provided for this change in

the ruling letter, and the Court has located no final determination in which Customs has

revisited the issue since.  Over the following fifteen years, Customs has repeatedly

issued determinations that various products were or were not substantially transformed

in the United States, without once claiming that it lacked statutory authority to do so.

---

[7]The Court notes that both of these ruling letters were issued by the same
Customs official, Harvey B. Fox, then the Director of the Office of Regulations and
Rulings.

Defendant, though, has raised an interesting point.  What if its client, Customs, has been issuing final determinations pursuant to Section 305(b)(1) that are beyond the scope of that statute?  As noted above, the nature of the ruling issued to Nukote was not unusual; more than half of the purported Section 305(b)(1) final determinations ever issued by Customs have addressed whether the articles in question were products of the United States.  If the theory advanced by Defendant is correct, Customs has flagrantly spurned the requirements of the statute and engaged in an unchecked pattern of *ultra vires* activity.  Fortunately, Defendant is wrong.

When issuing a Section 305(b)(1) final determination, as long as Customs actually determines the country of origin (or rules that the country of origin is indeterminate under the facts of the case), it complies with the requirements of 19 U.S.C. § 2515(b)(1) and 19 C.F.R. § 177 Subpart B.  As explained above, from the moment Customs makes its pronouncement regarding country of origin, whether the "article is or would be a product of a foreign country or instrumentality designated pursuant to" the TAA becomes self-evident.  See id.  This conclusion follows whether Customs rules that the article has been substantially transformed in Canada, North Korea, the United States, or any other country or instrumentality.  Additionally, a final determination that although sufficient facts have been presented, it cannot be determined where the product was substantially transformed, is also consistent with the statute.  Nothing in the statute

would require Customs to make a speculative final determination upon insufficient

facts.  Such a ruling would have the same practical effect as a negative Section 305(b)(1)

final determination—a finding that the articles in question do not qualify as products of

any DFCI.

### III.    HQ H009107 is Incomplete, and Warrants a Remand

While nothing about the inquiry *undertaken* in HQ H009107 was fundamentally

inconsistent with Section 305(b)(1), Customs left the job unfinished.  As the final

determination now stands, it fails to indicate whether Nukote's goods are or are not

products of a DFCI.  As such, the Court finds that a remand is appropriate.  Customs

adequately framed the issue in HQ H009107 as "[w]hat is the country of origin of the

subject laser printer cartridge models for the purpose of U.S. Government

procurement?"  (Compl. Ex. A.)  But, Customs held that "[t]he operations performed at

Nukote's Rochester, New York facility do not result in a substantial transformation of

the cartridges.  Therefore, the cartridges will not be considered to be products of the

United States." (Pl.'s Resp. at 6.)  The problem with this holding is that Customs fails to

establish *where* the goods have been substantially transformed, or even *if* they have been

substantially transformed.

It is possible, given the facts in this case, that substantial transformation occurred

in one of any number of countries, or that the country of origin is indeterminate.  In the

final determination, Customs explains that Nukote's printer cartridges are recycled

from empty toner cartridges that have been collected "in the United States and, to a

substantially lesser extent, in Canada, Singapore, the United Kingdom, Hong Kong and

China." (Id. at 2.)  The empty cartridges are sorted in an unnamed "foreign location,"

and certain manufacturing processes take place in an unnamed "second foreign

location," before final processes are undertaken in the United States.  (Id. at 5.)  It is

appropriate for Customs to first address whether any of these processes substantially

transformed Nukote's goods before the Court reaches the merits of this case.

    In the context of reviewing administrative action, the Supreme Court has stated

that a court cannot "be expected to chisel that which must be precise from what the

agency has left vague and indecisive."  SEC v. Chenery Corp., 332 U.S. 194, 197 (1947).

When an agency violates a statutory obligation to provide a clear decision, the court

must remand the decision to the agency for clarification, so that the court does not

"propel [itself] into the domain which Congress has set aside exclusively for the

administrative agency."  Id. at 196.  Moreover, this Court has explicit statutory

authority to "order any . . . form of relief that is appropriate in a civil action, including

. . . orders of remand."  28 U.S.C. § 2643(c)(1).[8]  Customs must remedy the shortcomings

in HQ H009107 by taking action consistent with Section 305(b)(1) of the TAA, consistent

---

[8]Additionally, the Court notes that Plaintiff has requested a remand in its prayer
for relief.  (Compl. 14.)

with its regulations set out in 19 C.F.R. Part 177, Subpart B which require the issuance of

a country of origin determination, and consistent with its 30 year practice of issuing

complete country of origin determinations.  On remand, Customs must identify the

country of origin of Nukote's printer cartridges for purposes of government

procurement, or, alternatively, make an explicit final determination that the country of

origin cannot be determined.  For the foregoing reasons, Defendant's motion to dismiss

is therefore denied, and this case is remanded to Customs.

## ORDER

Upon consideration of Defendant's motion to dismiss, Plaintiff's response

thereto, and Defendant's reply, and upon due deliberation, it is hereby

**ORDERED** that Defendant's motion to dismiss is hereby DENIED, and it is

further

**ORDERED** that no later than **Tuesday, February 8, 2011**, Customs shall file with

the Court a final determination upon remand that is consistent with this Opinion and

Order, and it is further

**ORDERED** that on remand, Customs must identify the country of origin of

Nukote's printer cartridges for purposes of government procurement, or, alternatively,

make an explicit final determination that the country of origin cannot be determined,

and it is further

*Court No. 07-00337*                                                              **Page 27**

    **ORDERED** that the parties shall submit to the Court no later than **Tuesday,**

**February 15, 2011** a joint proposed scheduling order governing the balance of this case.


                                                          /s/ Gregory W. Carman
                                                         Gregory W. Carman, Judge

Dated:       January 24, 2011
               New York, NY